IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
NORTHERN DIVISION

ROGER L. WARE,                              )
                                            )
Plaintiff,                                  )
                                            )
v.                                          )
                                            )          Case No 2:11-CV-78-SPM
                                            )
                                            )
MICHAEL J. ASTRUE,                          )
Commissioner of Social Security,            )
                                            )
Defendant.                                  )

## MEMORANDUM OPINION

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Defendant Michael J. Astrue, the Commissioner of Social Security, denying the application of Plaintiff Roger L. Ware for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* (the "Act").   The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge pursuant to Title 28 U.S.C. § 636(c)(1).  (Doc. 19). For the reasons stated below, the court reverses the Commissioner's denial of Plaintiff's application and remands the case for further proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff filed his application for benefits under Title II of the Act on March 2, 2010.  (Tr. 117-23).  Plaintiff's application was denied initially.  (Tr. 51).  A hearing was held before Eleanor T. Moser, an Administrative Law Judge ("ALJ") on February 15, 2011.  (Tr. 21-44). Following the hearing, on February 28, 2011, the ALJ found that Plaintiff was not disabled as defined in the Act.  (Tr. 9-18).  On September 2, the Appeals Council of the Social Security

Administration denied Plaintiff's request for review.  (Tr. 1-3).  Thus, the ALJ's decision stands as the final decision of the Commissioner.

On appeal, Plaintiff argues that (1) the ALJ erred by failing to give any weight to the opinions of Plaintiff's treating chiropractor, Melvin Rayburn, D.C., and (2) the Vocational Expert's testimony that he had acquired skills from his past work that were transferrable to sedentary jobs existing in significant numbers in the national economy was not supported by any evidentiary foundation.

## II.     FACTUAL BACKGROUND

### A. PLAINTIFF'S TESTIMONY

At the hearing before the ALJ on February 15, 2011, Plaintiff testified to the following. He was born on May 17, 1958.  (Tr. 22), and he weighs 310 pounds and is six feet, two inches tall.  He has a high school education.  (Tr. 22-23).  He is trained as a welder and mechanic.  (Tr. 31).  He has had refrigeration school training and training as a vocational instructor.  (Tr. 154).

Plaintiff has not worked since his alleged disability onset date of February 2, 2010.  His most recent job was as a tractor trailer mechanic.  (Tr. 24).  In that job, he used mechanic tools, used technical skills to repair trucks and trailers, and completed work orders.  (Tr. 177).  He was terminated from that job on around February 1, 2010; the reason given was that he "used a microwave and used some incorrect language," but he does not believe those were the real reasons.  At the time, he was physically able to do the job, but was hurting about every other day because he had difficulty climbing the ladders or crawling underneath the trucks.  (Tr. 25).  After he was discharged, he looked for a job but could not find one.  (Tr. 31).  He drew unemployment until September 2010.  (Tr. 31-32).

Prior to working as a tractor trailer mechanic, he worked as a vocational supervisor at a corrections center, supervising a metal fabrication plant.  (Tr. 25-26).  He did some work

2

himself, supervised employees, and instructed on welding and metal fabrication.  (Tr. 25-26, 178).  He does not believe he could perform the supervisor position at the prison anymore because he could not tolerate the pain of walking around like he used to.  (Tr. 34).  Prior to that job, Plaintiff worked as a welder/mechanic operator and as a welding instructor.  (Tr. 155).  When working as a welder/mechanic operator, he did maintenance on mining equipment, used his knowledge and skills in repairs, and filled and completed work orders and reports.  (Tr. 180).

Plaintiff's biggest problems that would prevent him from doing his past work are his ankle that turns in, his leg conditions, and his arthritis.  (Tr. 27).  His right knee locks up sometimes and causes him pain; he can only walk about 300 yards on level ground without ankle and right knee pain; he has to avoid steps and squatting; he has trouble standing in one spot for more than 15 minutes; he has pain in his knee if he sits in a straight chair for too long or sits in a car and cannot straighten his knee; and he has a history of surgeries on his knees.  (Tr. 27-30).  He also has arthritis and other pain in his right elbow, right shoulder, and back.  (Tr. 29-30).  He takes over-the-counter pain medications but cannot tolerate stronger ones.  (Tr. 32).  He has tried to lose weight and has not been able to.  (Tr. 35).

Plaintiff lives in a house with his wife.  (Tr. 33).  He takes care of his own lawn and grounds outside, and he helps with household chores but has to rest intermittently when doing them.  (Tr. 33, 35).  He has been a volunteer fireman for many years, but he can no longer climb up in the trucks and respond to fires like he used to; he helps with doing paperwork now.  (Tr. 33).  He plays cards with his family.  (Tr. 35).

### B.  MEDICAL RECORDS

Melvin Rayburn, D.C., a chiropractor, treated Plaintiff on several occasions from October 7, 1996 to December 8, 2010.  Plaintiff saw Dr. Rayburn twice in 1996, five times in 1997, twice in 1998, twice in 2000, twice in 2001, once in 2004, twice in 2006, once in 2007,

and three times in 2008, apparently for pain in his cervical, lumbar, and/or thoracic spine.  (Tr. 255-261).  Plaintiff saw Dr. Rayburn four times in 2010 for pain in the thoracic spine and for low back pain.  (Tr. 268, 273).  Dr. Rayburn's treatment notes for each visit are brief, three-to-six-line handwritten notations typically describing only the vertebrae involved and the treatment performed (such as application of heat and/or manipulation of the spine).  (Tr. 255-259, 268).  In a letter to Plaintiff's attorney dated February 8, 2011, Dr. Rayburn stated that during a December 8, 2010 appointment, he found L5 to be positioned left of normal with muscle spasms present.  (Tr. 273).

In early 2004, Plaintiff injured his left elbow and right knee in a fall at work and was treated on several occasions by Forest Conley, D.O., for elbow pain and severe and worsening knee pain.  (Tr. 234-44).  Plaintiff had surgery on May 20, 2004, and the postoperative diagnosis was medial meniscus tear, right knee; lateral meniscus tear, right knee; and grade three chondromalacia in the patellofemoral joint.  (Tr. 247).

In April and September 2009, Plaintiff was seen at the Columbia Orthopedic Group for pain in his knees and had surgery on both knees on April 22, 2009.  The post-operative diagnoses were chondromalacia, tear of the left medial meniscus, and median parapatellar plica.  (Tr. 218-19).  In a follow-up examination on September 23, 2009, Plaintiff was still having problems with his right knee, which the doctor believed was because of the marked degenerative changes seen in the right knee with erosion down to the bone.  (Tr. 207).  He was diagnosed with endstage right knee arthritis, and it was recommended that he exhaust all nonoperative methods before surgery; it was noted that even with surgery, he should not expect to be pain free.  (Tr. 206).

On April 19, 2010, Craig Heligman, M.D., completed a consultative examination of Plaintiff.  (Tr. 224-31).  Dr. Heligman observed no evidence of discomfort when Plaintiff was

4

seated in a chair or on the examining table, and Plaintiff was able to mount and dismount from the table and to undress and redress without assistance.  He had a full range of motion in his neck; a reduced range of motion in his back in forward flexion, extension, and left and right lateral flexion; a full strength and range of motion at the elbows, forearms, and wrists; reduced range of motion in the shoulders; and normal motion at the hips, knees, and left ankle.  He could not perform the toe walk test and had some problems with the heel walk test because of right ankle rotation.  His motor strength of the upper and lower extremities was 5/5.  He had diffuse swelling of both knees without tenderness.  He had mild diffuse lumbar tenderness.  (Tr. 226). Dr. Heligman noted that Plaintiff's reported level of pain (7/10) would require hospitalization for acute pain medication but that the rating was inconsistent with observed behaviors and clinical examination findings.  Dr. Heligman diagnosed osteoarthritis in both knees, congenital medial rotation of the right ankle, osteoarthritis of both shoulders and the right ankle, nonspecific back pain, obesity, and elevated blood pressure.  Dr. Heligman opined that Plaintiff was capable of functioning at the sedentary level of labor and that at that level he would have no restriction in sitting, standing, walking, lifting, carrying, handling objects, hearing, speaking, seeing, or traveling.  (Tr. 228).

On June 3, 2010, Dr. H.T. Lin, M.D., noted Plaintiff's high blood pressure and obesity and recommended a low salt diet, checking blood pressure at home, and Advil.  (Tr. 264-66). His notes are largely illegible.

On June 22, 2010, Dr. Rayburn completed a check-box-style Medical Source Statement-Physical (MSSP), in which he opined that Plaintiff could lift and/or carry 15 pounds frequently and 20 pounds occasionally; could stand and/or walk for 30 minutes at a  time and for two hours total in an eight-hour work day; could sit continuously for one hour at a time and for two hours

total in a work day; was limited in pushing and/or pulling ability; could never climb, stoop, kneel, crouch, or crawl; could occasionally reach, handle, finger, and hear; and could frequently balance, feel, see, and speak; needed to avoid any exposure to dust/fumes, vibrations, hazards, and heights; needed to avoid moderate exposure to extreme cold and heat, weather, and wetness/humidity; and suffers pain causing a need to lie down or recline twice for an hour during an eight-hour work day to alleviate symptoms; and that Plaintiff's pain or use of medication did not cause any decrease in concentration, persistence, or pace.  (Tr. 270-71).

### C.  VOCATIONAL EVIDENCE

Vocational Expert (VE) Cary Bartlow testified at the hearing before the ALJ.  (Tr. 36-44).  He testified that he has been a vocational rehabilitation counselor for over 40 years.  (Tr. 46).  The VE testified that based on Plaintiff's testimony and the paperwork he filled out, Plaintiff's past work as a tractor trailer mechanic was medium and skilled, SVP level seven; his work as a welding instructor was light and skilled, SVP level six; and his past work as a prison industry supervisor was light and skilled, SVP level eight.  (Tr. 37-38).  The ALJ described the following hypothetical individual to the VE:

> Please assume we have a hypothetical individual same age as the claimant, same education and the same work history just described.  This hypothetical individual can lift 10 pounds occasionally and 10 pounds or less frequently.  He can stand or walk with normal breaks two hours of an eight-hour day, sit with normal breaks about six hours of an eight-hour day; he can occasionally climb, balance, stoop, kneel, crouch and crawl. . . .  He should avoid concentration [sic] exposure to vibration and to hazards such as unprotected machinery and heights, et cetera.  He is capable of functioning at the sedentary level.  The claimant has not alleged any non-exertional limitations other than pain which he controls with over-the-counter medication.  Could this hypothetical individual do any of the jobs the claimant has done in the past?

(Tr. 38-39).  The VE testified that such an individual could not.  However, he testified that there were other jobs in the national economy that he could do.  (Tr. 39).

The VE testified that Plaintiff had acquired the following skills from past jobs: record-keeping, teaching, the use of hand and power tools, mechanical maintenance and repair, welding, cutting, report writing, brazing, cutting and measuring, mechanical maintenance repair, reading schematics, and performing precision work.   (Tr. 39-40).   He testified that with Plaintiff's transferable skills, Plaintiff could perform the jobs of records clerk (sedentary, semiskilled, SVP 3, DOT code 203.582-066), and work order clerk (sedentary semiskilled, SVP 3, DOT code 221.382-022).  (Tr. 39).   However, the VE emphasized that he would reduce the occupational base for each of those jobs to reflect his opinion that the jobs he identified would use different kinds of tools, machinery, work processes, industries, raw materials, and work settings involved than did Plaintiff's past jobs.  (Tr. 40).  Specifically, he testified that the number of jobs Plaintiff could do would be reduced by half to two thirds,[1] such that there would be 82,000 records clerk jobs in the national economy Plaintiff could perform, 500 in Missouri, and 44,000 work order clerk jobs in the national economy Plaintiff could perform, 500 in Missouri.  (Tr. 39-41).

The VE testified that the overall numbers of those jobs in the national economy were derived from the Occupational Outlook Handbook, unemployment statistics, and regional districts.  (Tr. 42).  The overall numbers of Missouri jobs came from the Missouri Economic and Research Center, the regional state employment and unemployment summary, the Missouri Career Report Card, and the unemployment records from Missouri.  (Tr. 42).  However, upon questioning by Plaintiff's attorney, the VE testified that his reduction in the numbers based on Plaintiff's transferable skills was not based on a mathematical formula or statistical analysis, but rather on "experience and knowledge of the jobs and recognition of these—where these skills are

---

[1] The VE's testimony on the amount of the adjustment is unclear from the record.  At one point, he stated that he had reduced the occupational base by "almost two-thirds."  (Tr. 40).  Shortly after that, he testified that the adjustment was "50 percent."  (Tr. 41).

applicable.  It's an opinion, it's not based on statistical analysis—opinion based on 40 years experience in job placement."  (Tr. 43).

### III.    DECISION OF THE ALJ

The ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date; that he had the severe impairments of obesity, birth deformity right lower leg bone, arthritis and pain in right knee, ankle, shoulder, elbow, upper back and deteriorating disc in upper back; that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1; that Plaintiff had the residual functional capacity to perform sedentary work except that he should avoid concentrated exposure to vibrations, heights and machinery; and that Plaintiff was unable to perform any past relevant work.

The ALJ noted that Plaintiff was 51 years old, which is defined as an individual closely approaching advanced age, on his alleged disability date, and that Plaintiff has at least a high school education and was able to communicate in English.  The ALJ also found, based on the testimony of a vocational expert, that Plaintiff had acquired transferable skills from his past work that would allow him to perform other jobs existing in significant numbers in the national economy—specifically, record clerk (*Dictionary of Occupational Titles* ("DOT") No. 203.582-066) and work order clerk (DOT  No. 221.382-022).  She concluded that considering Plaintiff's age, education, and transferable work skills, a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rule 201.15.  Therefore, she found that Plaintiff was not disabled.  (Tr. 11-18).

## IV.   <u>GENERAL LEGAL PRINCIPLES</u>

The court's role in reviewing the Commissioner's decision is to determine whether the decision "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quoting *Ford v. Astrue*, 518 F.3d 979, 981 (8th Cir. 2008)).   "Substantial evidence is 'less than preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.'"  *Renstrom v. Astrue*, 680 F.3d 1057, 1063 (8th Cir. 2012) (quoting *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009)).   In determining whether substantial evidence supports the Commissioner's decision, the court considers both evidence that supports that decision and evidence that detracts from that decision.  *Id.*  However, the court "'do[es] not reweigh the evidence presented to the ALJ, and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reasons and substantial evidence.'"  *Id.* (quoting *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006)).   "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision.'"  *Partee v. Astrue*, 638 F.3d 860, 863 (8th Cir. 2011) (quoting *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005)).

The Social Security Act defines as disabled a person who is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A); *see also Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010).   The impairment must be "of such severity that [the claimant] is not only unable to do his previous work but cannot, considering his

9

age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 1382c(a)(3)(B).

A five-step regulatory framework is used to determine whether an individual claimant qualifies for disability benefits.  20 C.F.R. § 404.1520(a); *see also McCoy v. Astrue*, 648 F.3d 605, 611 (8th Cir. 2011) (discussing the five-step process).  At Step One, the ALJ determines whether the claimant is currently engaging in "substantial gainful activity"; if so, then he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(i); *McCoy*, 648 F.3d at 611.  At Step Two, the ALJ determines whether the claimant has a severe impairment, which is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities"; if the claimant does not have a severe impairment, he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 404.1520(c); *McCoy*, 648 F.3d at 611.  At Step Three, the ALJ evaluates whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the "listings").  20 C.F.R. § 404.1520(a)(4)(iii).  If the claimant has such an impairment, the Commissioner will find the claimant disabled; if not, the ALJ proceeds with the rest of the five-step process.  20 C.F.R. § 404.1520(d); *McCoy*, 648 F.3d at 611.

Prior to Step Four, the ALJ must assess the claimant's "residual functional capacity" ("RFC"), which is "the most a claimant can do despite [his] limitations."  *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009) (citing 20 C.F.R. § 404.1545(a)(1)); *see also* 20 C.F.R. § 404.1520(e).  At Step Four, the ALJ determines whether the claimant can return to his past relevant work, by comparing the claimant's RFC with the physical and mental demands of the

claimant's past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(f); *McCoy*, 648 F.3d at 611.  If the claimant can perform his past relevant work, he is not disabled; if the claimant cannot, the analysis proceeds to the next step.  *Id.*  At Step Five, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant can make an adjustment to other work in the national economy; if the claimant cannot make an adjustment to other work, the claimant will be found disabled.  20 C.F.R. § 404.1520(a)(4)(v); *McCoy*, 648 F.3d at 611.

Through Step Four, the burden remains with the claimant to prove that he is disabled. *Moore*, 572 F.3d at 523.  At Step Five, the burden shifts to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy.  *Id.*; *Brock v. Astrue*, 674 F.3d 1062, 1064 (8th Cir. 2012).

## V.    DISCUSSION

In appealing the ALJ's decision, Plaintiff argues (1) that the ALJ erred by failing to give any weight to the Medical Source Statement-Physical of Plaintiff's treating chiropractor, Melvin Rayburn, D.C., and (2) that the ALJ did not meet her burden of showing that Plaintiff could perform work existing in significant numbers in the national economy, because the Vocational Expert's testimony regarding his transferable skills and the number of jobs he could perform was not supported by any evidentiary foundation.

### A.  THE ALJ'S CONSIDERATION OF THE MEDICAL SOURCE STATEMENT OF MELVIN RAYBURN, D.C.

Plaintiff's first argument is that the ALJ erred by failing to give any weight to the Medical Source Statement-Physical of his chiropractor, Melvin Rayburn, D.C., in which Dr. Rayburn opined that Plaintiff had various limitations, including the ability to stand and/or walk

for only 30 minutes at a time and for two hours total in an eight-hour work day and to sit continuously for one hour at a time and for two hours total in a work day.

The court first notes that a chiropractor is not an "acceptable medical source" under the regulations, but is rather an "other" medical source.  20 C.F.R. §§ 404.1513(a) & (d)(1).  Thus, Dr. Rayburn was not a "treating source" whose medical opinion may be entitled to controlling weight.  *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); Social Security Ruling 06-03p ("SSR 06-03p") (noting that "only 'acceptable medical sources' can be considered treating sources, as defined in 20 C.F.R. 404.1502 and 416.902, whose medical opinions may be entitled to controlling weight.").   In addition, "only 'acceptable medical sources' can give [the Commissioner] medical opinions."  SSR 06-03p.

The opinion of an "other" medical source must be considered in accordance with SSR 06-03p.  *See* 20 C.F.R. §§ 404.1513(d); SSR 06-03p.  "Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case."  SSR 06-03p.  In weighing opinions from other sources, the factors to be considered may include the length and frequency of the relationship, how consistent the opinion is with other evidence, the degree to which the source presents relevant evidence to support an opinion, how well the source explains the opinion, whether the source has a specialty or area of expertise related to the impairment(s), and other factors.  *Id.*  The ALJ has more discretion when evaluating an opinion from an other

medical source than when evaluating an opinion from an acceptable medical source.  *Raney v. Barnhart*, 396 F.3d 1007, 1009 (8th Cir. 2005).

Contrary to Plaintiff's assertion that the ALJ "ignored" Dr. Rayburn's MSSP, Pl's. Br. at 11, the ALJ explicitly considered it and appropriately declined to give it significant weight. First, the ALJ expressly discussed both Dr. Rayburn's history of treating Plaintiff and the MSSP he submitted.  (Tr. 13, 16).  Second, the ALJ correctly recognized that Dr. Rayburn was not an acceptable medical source and could not offer medical opinions.  (Tr. 16).  *See* 20 C.F.R. §§ 404.1513(a) & (d); SSR 06-03p.  Third, and importantly, the ALJ properly noted that "Dr. Rayburn provided no objective findings on which he based his conclusions."  (Tr. 16).  Dr. Rayburn's opinion consisted of a checklist form and contained no explanations.  (Tr. 270-71). Moreover, Dr. Rayburn's treatment notes in the record are minimal and consist of only very brief notations regarding pain and chiropractic treatments provided; they do not support or explain the very restrictive limitations on sitting, standing, walking, and other activities described in Dr. Rayburn's MSSP.  (Tr. 255-61, 268).  These were appropriate reasons to discount Dr. Rayburn's opinion.  *See Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (finding that an ALJ properly discounted an opinion in part because it was conclusory, consisted of checklist forms, cited no medical evidence, and provided little to no elaboration); *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001) (noting that the checklist format of an RFC assessment limited its evidentiary value); SSR 06-03p (noting that the factors to be considered in weighing an opinion include "the degree to which the source presents relevant evidence to support an opinion" and "how well the source explains the opinion").

Furthermore, Dr. Rayburn's opinion was inconsistent with the other medical and other evidence in the record, which the ALJ discussed in detail.  (Tr. 12-16).  For example,

consultative examiner Dr. Heligman, whose opinion the ALJ gave "great weight," performed objective testing and examination of Plaintiff and concluded that Plaintiff could function at the sedentary level, with no limitations on sitting standing, walking, or traveling.  (Tr. 12-13, 15-16, 228).  In addition, Plaintiff's own testimony that he performed household chores, took care of his yard, played cards with his family, and served as a volunteer for the fire department doing paperwork and other tasks was somewhat inconsistent with the extremely restrictive limitations in Dr. Rayburn's MSSP.  (Tr. 33, 35).

The court acknowledges that the ALJ's discussion of Dr. Rayburn's opinion appears to contain some misstatements.  First, the ALJ indicated that Dr. Rayburn said that Plaintiff had pain two times a day that lasted for an hour, when actually the check-box form appears to indicate that Dr. Rayburn stated that Plaintiff's pain would cause him to need to lie down twice a day for an hour.  (Tr. 271).  In addition, the ALJ indicated that Dr. Rayburn had stated that Plaintiff was unable to sustain gainful employment due to muscle spasms and pain and found that that statement was an opinion reserved to the Commissioner and not entitled to controlling weight, when actually Dr. Rayburn does not appear to have made that explicit statement.  However, there is no indication that these errors caused any prejudice to Plaintiff.  There is no indication that the ALJ would have evaluated Dr. Rayburn's opinion or Plaintiff's abilities differently had she properly interpreted Dr. Rayburn's statement about Plaintiff's need to lie down, nor is there any indication that she would have given his opinion more weight had she realized that he had not included an explicit statement that Plaintiff could not work.  The ALJ's evaluation of Dr. Rayburn's opinion was otherwise well supported, and her opinion that Plaintiff could perform sedentary work with some limitations was well-supported by other evidence in the record, including the opinion of the consulting physician, Dr. Heligman.  Thus, the undersigned

14

finds these errors in the ALJ's reading of Dr. Rayburn's opinion to be harmless.  *See Van Vickle v. Astrue*, 539 F.3d 825, 830-31 (8th Cir. 2008) (finding harmless the ALJ's mistaken reading of a doctor's report where there was no indication that the ALJ would have decided differently if he had read the report correctly).

### B.   THE ALJ'S FINDING THAT PLAINTIFF HAS ACQUIRED TRANSFERABLE SKILLS AND CAN THEREFORE PERFORM JOBS EXISTING IN SIGNIFICANT NUMBERS IN THE NATIONAL ECONOMY

Plaintiff's second argument is that the ALJ did not meet her burden at Step Five of finding other work at the sedentary level that Plaintiff could do.  Specifically, he challenges the VE's testimony regarding Plaintiff's transferable skills and the number of jobs Plaintiff could perform with those skills, arguing that the VE "did not have any foundation to support his answers."  *See* Pl's Br. at 14.  The court agrees that the VE's testimony was not adequately supported and finds that the ALJ's finding at Step Five was not supported by substantial evidence.

At Step Five, the ALJ considers the Plaintiff's RFC, along with Plaintiff's age, education, and work experience, to determine whether Plaintiff can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4)(v).  Under the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, an individual of Plaintiff's age[2] and education level, with a sedentary RFC, is considered "disabled" unless he has transferable skills.  20 C.F.R. Part 404, Subpart P, Appendix 2, §§ 201.14, 201.15.  A claimant has transferable skills "when the skilled or semi-skilled work activities [the claimant] did in the past can be used to meet the requirements of skilled or semi-skilled work activities of other jobs or kinds of work."   20 C.F.R.

---

[2] Plaintiff was born on May 17, 1958, and thus was an "individual approaching advanced age (age 50-54)" from the date of his disability onset in February 2010 through the date of the ALJ's decision in February 2011.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.00(g).

§ 404.1568(d)(1).  "Transferability is most probable and meaningful among jobs in which—(i) The same or a lesser degree of skill is required; (ii) The same or similar tools and machines are used; and (iii) The same or similar raw materials, products, processes, or services are involved." 20 C.F.R. § 404.1568(d)(2).

Here, the ALJ determined that Plaintiff was not disabled based on Medical-Vocational Guideline 201.15 and the testimony of the VE that Plaintiff had acquired transferable skills from his past work that could be used to perform other sedentary jobs existing in significant numbers in the national economy.  The VE testified that Plaintiff had acquired the following skills from his past work: welding, cutting and measuring, brazing, mechanical maintenance repair, use of hand and power tools, reading schematics, performing precision work, teaching, record keeping, and report writing.  (Tr. 37, 39-40).  He testified that with Plaintiff's transferable skills and his RFC, Plaintiff could perform the jobs of records clerk (sedentary, semiskilled, SVP 3, DOT No. 203.582-066), and work order clerk (sedentary, semiskilled, SVP 3, DOT No. 221.382-022). (Tr. 39).  However, the VE testified that he would reduce the occupational base for each of those jobs by one-half or two-thirds to reflect his opinion that there would be "a moderate adjustment in terms of the different kinds of tools, the different kinds of machinery, the different kind of work processes, the different kind of industries" and his opinion that Plaintiff's skills "would be used differently in terms of working with different products and services and different raw materials, work processes, work settings and industry."  (Tr. 40-42).  He testified that after his adjustments, that there would be 82,000 records clerk jobs in the national economy Plaintiff could perform (500 in Missouri), and 44,000 work order clerk jobs in the national economy Plaintiff could perform (500 in Missouri).  (Tr. 39-41).

Relying on this testimony, the ALJ found that because Plaintiff had transferable skills that could be used to meet the requirements of substantial numbers of jobs in the national economy, a finding of "not disabled" was appropriate under the framework of Medical-Vocational Rule 201.15.  (Tr. 17).

The occupation the VE described as "records clerk" describes jobs in which an individual does the following:

> Operates typewriter or computer to type and revise documents: Compiles material to be typed.   Reads instructions accompanying material, or follows verbal instructions from supervisor or person requesting document, to determine format desired, number of copies needed, priority, and other requirements.  Types and revises material such as correspondence, reports, statistical tables, addresses, and forms, from rough draft, corrected copy, recorded voice dictation, or previous version displayed on screen, using typewriter or computer and word processing software.  May verify totals on report forms, requisitions, or bills.  May operate duplicating machine to reproduce copy.

DOT 203.582-066.  The occupation the VE described as "work order clerk" describes jobs in which the individual does the following:

> Receives interdepartmental work orders for construction or repairs, routes work orders to maintenance shop, and compiles cost reports: Files copy of each work order received, and routes original copy to maintenance shop.  Receives and files cost reports of work accomplished, and prepares bills to be charged against department requesting construction or repairs.   Types cost reports of work completed or in progress.

DOT 221.382-022.

Most of the skills the VE identified that Plaintiff had acquired from his past work do not appear to apply to these jobs.  Although the VE identified some skills Plaintiff has acquired that might apply to the jobs he described, such as "reading schematics," "record-keeping," and "report writing," it is unclear how he determined from the record that Plaintiff had acquired either those skills or the other skills that would be necessary to perform the records clerk or work order clerk jobs.  Plaintiff's testimony regarding his past work was minimal and concerned only

17

the physical work he performed as a welder and mechanic and the work he performed supervising and instructing other people in performing similar work.  Those activities do not appear to involve the use of skills transferable to the jobs the VE identified.  (Tr. 25-26, 31, 34).  In his Work History Report, Plaintiff did state that in his job as a tractor trailer mechanic, he "complet[ed] work orders"; that in his job supervising a metal fabrication plant, he "completed orders"; and that in his job as a welder, mechanic, and equipment operator (last held in 1991), he "filled + completed work orders + reports" in addition to his other duties.  (Tr. 176-80).  However, it is unclear from those statements what those activities actually involved.  Plaintiff did not mention operating a typewriter or computer, typing or revising documents, or using word processing software (as required for the records clerk jobs), nor did he mention typing, filing, compiling cost reports, or preparing bills (as required for the work order clerk jobs).  It is possible that Plaintiff's past work involved these activities, but the current record does not show that it did.

Moreover, although the VE testified that the occupational base would be reduced by one-half or two-thirds for the jobs he identified, it is unclear to the court what the basis of this statement was.  Although the VE stated very generally that the jobs he identified involved different tools, machinery, raw materials, work processes, work settings, and industries, he did not explain how those factors would affect the transferability of Plaintiff's skills to the jobs of records clerk or work order clerk.  It does not appear from the DOT descriptions of those jobs that they require skills dependent on particular types of machinery, tools, or raw materials, such that Plaintiff might have the skills needed for some of the jobs and not others.  In addition, to the extent that those factors are different between the jobs Plaintiff has done in the past and the jobs

the VE identified, that weighs against a finding of transferable skills,  20 C.F.R. § 404.1568(d)(2), and the VE did not explain how or to what degree those factors were different.

In light of all of the above, the court finds that the ALJ's finding that Plaintiff had transferable skills and could therefore perform significant numbers of jobs existing in the national economy was not supported by substantial evidence. *See Slater v. Astrue*, No. 6:10-cv-03385-NKL, 2011 WL 2604817, at *3-4 (W.D. Mo. July 1, 2011) (reversing and remanding where, although the VE had testified that the plaintiff had skills from her past work that would transfer to another job, the court could not find evidence in the record that the plaintiff could actually perform one of the skills required of the job the VE identified); *Beardsley v. Astrue*, 496 F. Supp. 2d 1031, 1033-34 (S.D. Iowa 2007) (reversing and remanding where the ALJ relied on a VE's overly broad description of Plaintiff's skills and overly broad testimony regarding how those skills would transfer to other jobs; noting, "The question here is not whether he could do the job of an order filler or rental car deliverer. Nearly anyone could learn to do those jobs if given a month or two to learn.  The question is whether or not his skills qualify him to do those jobs."); *cf. Evans v. Shalala*, 21 F.3d 832, 835 (8th Cir. 1994) (cautioning the ALJ against overly broad characterizations of Plaintiff's past relevant work).

Thus, the court will reverse and remand the case for further consideration, including possibly the development of additional testimony from the Plaintiff and/or the VE regarding the nature of the Plaintiff's past relevant work and the way in which any skills he developed in that work would be transferable to other jobs (if any) consistent with Plaintiff's RFC and existing in significant numbers in the national economy.

## VI.    <u>CONCLUSION</u>

For all of the foregoing reasons, the court finds the ALJ's decision is not supported by substantial evidence.  Accordingly,

**IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the decision of the Commissioner of Social Security is **REVERSED** and this matter is **REMANDED** for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).


/s/Shirley Padmore Mensah
SHIRLEY PADMORE MENSAH
UNITED STATES MAGISTRATE JUDGE


Dated this <u>16th</u> day of January, 2013.

20